IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2013

## BRYAN R. MILAM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Wayne County**
**No. 15059     Jim T. Hamilton, Judge**

**No. M2012-01981-CCA-R3-PC - Filed January 15, 2014**

The Petitioner, Bryan R. Milam, appeals the Wayne County Circuit Court's denial of his petition for post-conviction relief from his convictions for first degree murder and second degree murder and resulting sentence of life plus twenty-three years. On appeal, the Petitioner contends that the post-conviction court erred in denying relief because he was denied the effective assistance of counsel at trial, at the motion for new trial hearing, and on appeal. Specifically, the Petitioner argues that his various attorneys (1) failed to present rebuttal medical evidence concerning the "tight" nature of the victim's wound or challenge the credibility of the medical examiner, Dr. Charles Harlan, who had lost his medical license following the Petitioner's convictions; and (2) failed to present a firearms expert who had tested the condition of the murder weapon and determined that it was not working properly. Following our review, we affirm the denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Robert C. Richardson, Jr., (at post-conviction hearing and on appeal), Columbia, Tennessee; and Chelsea Nicholson (on appeal), Nashville, Tennessee, for the appellant, Bryan R. Milam.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; T. Michel Bottoms, District Attorney General; and J. Douglas Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

The Petitioner was indicted by the Wayne County Grand Jury for two counts of first

degree premeditated murder resulting from the May 15, 1996 shooting death of his pregnant wife. After successfully appealing his initial convictions for both counts, the Petitioner was retried and convicted of first degree murder for the shooting death of his wife and second degree murder for the death of his unborn child. See State v. Brian[1] Milam, No. M2008-00695-CCA-R3-CD, 2010 WL 744398 (Tenn. Crim. App. Mar. 3, 2010) (second direct appeal, convictions and sentences affirmed by this court), perm. app. denied, (Tenn. Aug. 26, 2010); see also State v. Bryan A. Milam, No. 01C01-9712-CC-00557, 1999 WL 701419 (Tenn. Crim. App. Sept. 10, 1999) (first direct appeal, convictions reversed by this court). The Petitioner was sentenced to life for first degree murder and twenty-three years for second degree murder, to be served consecutively. See Milam, 2010 WL 744398, at *9.

The following evidence, as recited by this court on direct appeal, was adduced at the Petitioner's second trial:

> On May 12th or 13th 1996, [the Petitioner] and Ernest Moyer were canoeing on the Buffalo River. When they returned to [the Petitioner's] house, Mr. Moyer overheard [the Petitioner] and the victim arguing about a charge account at a store. Mr. Moyer saw [the Petitioner] pull a gun out and say that "he'd put a hole through her and that goddamn baby." Mr. Moyer saw [the Petitioner] follow the victim down the hall towards the bedrooms with his gun in his hand. Mr. Moyer grabbed the two children who were in the house and took them out onto the front porch. Mr. Moyer did not see [the Petitioner] shoot or hit his wife that day.
>
> On May 15, 1996, Heather Olive was visiting Jason and April Griggs who lived two houses down from [the Petitioner] and the victim. Ms. Olive and Mrs. Griggs both testified to the following facts. Ms. Olive and the Griggses were visiting outside in the driveway. They saw [the Petitioner] arrive home. He drove up into the yard and went inside his house. They heard a shot and saw children running and screaming out of the victim's house. The children ran across the street to a neighbor's house. [The Petitioner] came out of the house, went to the car, got something out of the car, ran around to the back of the house, and went back into the house. He was in a hurry but was not hysterical. Ms. Olive and the Griggses heard another shot. [The Petitioner] came back out of the house, ran around the house, and went back in again. When [the Petitioner] ran around the house, Ms. Olive positioned herself so she could watch him. She saw [the Petitioner] throw something into the woods. [The Petitioner] was not hysterical. Shortly thereafter, [the

---

[1] The Petitioner's first name was spelled as "Brian" in his second direct appeal to this court.

Petitioner] came out of the house pulling the victim's body. [The Petitioner] was hysterical and repeating, "Why did you do this, baby? Don't leave me, baby." When Police Chief Gene Seitz arrived on the scene, Ms. Olive told him that she saw [the Petitioner] throw something in the woods.

Ms. Pam Askins also lived in the neighborhood. On the evening in question, she was getting ready to take her baby for a walk in the stroller. She saw the Griggses outside their house. She heard a gunshot and saw the children run out of the house. Ms. Askins heard another gunshot and saw [the Petitioner] run out of the house and go to his car. She returned home and called [the Petitioner's] grandmother to tell her that there had been an accident at the house and see if she wanted to go to the hospital. Ms. Askins picked [the Petitioner's] grandmother up in the car and took her to the hospital. At the hospital, [the Petitioner] told Ms. Askins that the victim had shot herself and indicated that she had shot herself under the chin.

Jay McWilliams and his wife Sharon lived directly across the street from [the Petitioner] and the victim. On the evening of May 15, 1996, he was standing in his carport. While he was there, he heard a gunshot inside the house across the street. Then he saw three children come across the street to his house. The oldest, Falen, was saying, "My brother is going to shoot hisself [sic]" and "Call 911, Call 911. My brother has shot his wife." Edith Dickson was staying with Sharon and Jay McWilliams, her daughter and son-in-law. She was washing dishes when a boy arrived at the kitchen door who was crying and yelling "Call 911." A girl with him said, "My brother has shot his wife." Another child said, "Daddy had shot his wife and blood was running out on the pillow." Another child said, "Oh, my mama has got a baby in her belly and my baby is dead." Ms. Dickson stopped washing the dishes when the children came into the house. She heard a gunshot. Mrs. McWilliams was at the carport door when she heard a gunshot and called 911 after hearing the gunshot. Mr. McWilliams went back outside and saw [the Petitioner] carrying the victim out of the house when Chief Seitz arrived. Chief Seitz told [the Petitioner] to put his wife down on the ground. Mr. McWilliams heard [the Petitioner] tell Chief Seitz to call an ambulance. The McWilliams family kept the children in the living room and tried to calm them down.

Chief Seitz of Waynesboro was at home on May 15, 1996. He heard a call on his police scanner about shots being fired. Chief Seitz called the dispatcher and discovered that the shots were being fired at the Milam residence. He told the dispatcher he was on his way. When he arrived, he

noticed a group of adults and children in the yard across the street from the Milam residence. He walked toward the door, and [the Petitioner] came running out of the door. [The Petitioner] was crying and hysterical. He also was covered with blood. [The Petitioner] said "Help me. My wife's been shot." Chief Seitz entered the home and found the victim, who was [the Petitioner's] wife, on the couch with her head slumped over her chest. Chief Seitz walked over to her and noticed a gun laying on the couch to her right and blood everywhere. Chief Seitz opined at trial that there was no way that the victim could have reached the gun from her position on the couch. At the scene, he saw that the victim had a bullet hole below her scalp in the center of her forehead. Later at the hospital, he discovered that there was an exit wound at the base of her skull below the hairline.

He told [the Petitioner] that he was going to call for help and went outside to his patrol car. When Chief Seitz turned to get out of the car, Sergeant Chris Ray was arriving, and [the Petitioner] was coming through the front door carrying the victim. Chief Seitz forced [the Petitioner] to the ground with the victim, and the ambulance arrived at that time. Chief Seitz noticed that the victim's body was lifeless. While emergency personnel began to work on the victim, Chief Seitz and Sergeant Ray went to look for any other individuals in the house. They did not perform a crime scene investigation. Immediately after the ambulance arrived, [the Petitioner] ran and got into a car, jumped a ditch with the car, and left before the ambulance. Chief Seitz later discovered that [the Petitioner] proceeded to the hospital.

Dr. Harold Polk is the medical director for the emergency room at the Wayne County Medical Center where the victim was taken. On the day in question he was at the hospital teaching a class. He went to the emergency room in response to a "Code Blue" that had been called at the hospital. He and another doctor went outside the emergency room to await the ambulance. He saw a car rapidly approaching the emergency room. He saw the driver get out of the car, and later learned that it was [the Petitioner]. [The Petitioner] appeared to be very upset and was asking where the ambulance was. [The Petitioner's] clothes were stained with lots of blood. The ambulance arrived at 7:45 p.m. Emergency personnel wheeled the victim into the emergency room. Dr. Polk noticed that she was covered in blood and that there was an injury to her forehead. The victim was not responding to any efforts by emergency personnel. The hospital had been told that the victim was pregnant, Dr. Polk had assembled a surgery team to attempt to save the infant. The surgery team performed a cesarean section. When the infant was delivered it

-4-

was dead. Dr. Polk stated that an infant born at thirty-two weeks, the age of the victim's infant, who was in the same physical condition as far as weight, "would have very much a potential to survive." Dr. Polk had an opportunity to speak with [the Petitioner]. [The Petitioner] told Dr. Polk that the victim had grabbed the gun from him, and then [the Petitioner] pointed his hands at his head and said "bang."

Chief Seitz remained at the scene after the ambulance left. He and Sergeant Ray taped off and secured the scene. The Tennessee Bureau of Investigation ("TBI") crime scene investigators arrived around 9:30 p.m. The TBI investigators took pictures of the scene and collected evidence. Chief Seitz said that the TBI agents found two empty bullet casings laying on the floor, about a foot and a half in front of the couch. Several 9 millimeter casings with bullets in them were found in between the cushions of the couch. Chief Seitz also observed a bullet hole that started at the top of one cushion, exited at the bottom of the cushion, entered the wall behind the couch, and lodged in an electrical outlet on the other side of the wall. This bullet hole was directly behind where the victim's head had been when she was sitting on the couch. A second bullet hole was found in the living room inside the front entrance. This wall is on the opposite wall from the couch.

Chief Seitz also conducted a search about thirty yards behind the house. He found a black weapons carrying case at the edge of the woods bordering the backyard. Chief Seitz called one of the TBI agents out to investigate it. The TBI agent collected the case and opened it in Chief Seitz's presence. It contained a Tach 9, which can be either an automatic or semi-automatic pistol.

Sergeant Ray noticed that there was a blue Toyota sitting in the driveway. There was blood smeared on the driver's side door. When [the Petitioner] carried the victim out of the house toward Chief Seitz, Sergeant Ray was in the vicinity. He stated that the smell of alcohol on [the Petitioner] was obvious. Sergeant Ray stated that if [the Petitioner] had been driving and Sergeant Ray had pulled him over, the level of alcohol smell on [the Petitioner] would have prompted him to administer some field sobriety tests. Sergeant Ray stated that he interviewed Falen Swafford, [the Petitioner's] sister. Miss Swafford told him that [the Petitioner] and the victim had been fighting.

At the time of the incident, Chief Byron Skelton was an investigator with the Waynesboro Police Department. He arrived at the scene at 7:49 p.m.

the day of the incident. He went inside the house and saw a couch with a large pool of blood and a gun laying on the right end of the couch. He also noticed some broken pottery and furniture that had been turned over in the dining room. Chief Skelton also found a telephone laying on the floor in the kitchen with a large concentration of blood around it. The kitchen is behind the living room and is separated from the living room by a wall. Chief Skelton went to the hospital to observe the victim. He stated that she had a star-shaped, entrance wound on her forehead and an exit wound at the base of her skull.

Chief Skelton and another investigator proceeded to the Wayne County Jail to interview [the Petitioner]. The officers Mirandized [the Petitioner]. [The Petitioner] was calm throughout this exchange. The other officer informed [the Petitioner] that the victim had died. [The Petitioner] jumped from the chair he had been sitting in and turned the table over. He dropped to the floor and accused the officers of "messing with him." [The Petitioner] curled up on the floor in a fetal position. Chief Skelton attempted to console [the Petitioner]. [The Petitioner] grabbed his hair with both hands and began beating his head on the floor. Chief Skelton calmed [the Petitioner] down and convinced [the Petitioner] to sit in a chair. Chief Skelton asked [the Petitioner] what had happened. [The Petitioner] answered Chief Skelton's questions calmly and logically. [The Petitioner] told Chief Skelton that he had been moving furniture and went to Willie's Bar and Grill afterwards. He called the victim to come pick him up at Willie's. When they arrived home, he decided he wanted to go back. The victim began "bitching and raising hell" about [the Petitioner] returning to the bar. He grabbed his Jennings 9 from the couch and put it in his back pocket. The victim grabbed it out of his pocket. [The Petitioner] turned around and reached for the gun, and it went off twice. [The Petitioner] admitted to Chief Skelton that he was already carrying a Tach 9 when he arrived home. He told Chief Skelton that he threw the Tach 9 in the woods after the shooting because he thought that it was illegal. [The Petitioner] also told Chief Skelton that he called the operator after the victim was shot. Chief Skelton confirmed that [the Petitioner] called the operator at 7:20 p.m.

Special Agent Wayne Wesson is a criminal investigator with the TBI. He was called to the scene around 9:00 p.m. and arrived around 9:30 p.m. He was escorted to the house by Sergeant Ray. When he arrived, Agent Wesson looked through the window and saw that the house was in disarray. There was blood on both the couch and the storm window on the front porch. Sergeant Ray informed Agent Wesson that the victim had already been transported to

-6-

the hospital. At the hospital, Sergeant Ray photographed the wounds on the victim's body. He photographed a contact wound to the forehead and an exit wound in the hairline on the back of her head. Agent Wesson stated that the wound to the forehead was a classic contact wound because with a contact wound "you find a star-shaped splitting of the skin because the gases that are expelled from the barrel, as the bullet is projected out of the barrel, do not go into the skull. They disperse beneath the skin and explode backwards, giving you a star-shaped wound." To achieve a contact wound, the weapon must be placed against the skin.

Agent Wesson spoke with [the Petitioner] while he was at the hospital. He took an oral statement. [The Petitioner] was very upset at the hospital, but was not hysterical during the interview until the end of the interview. Agent Wesson asked [the Petitioner] what had happened to the victim and how she ended up with a gunshot wound to the forehead. Agent Wesson also asked [the Petitioner] if the gun on the couch or the gun in the woods is what [the Petitioner] shot her with. Agent Wesson testified to the following exchange with [the Petitioner]:

> I asked him to tell me what happened. He said that he had gotten home from Willie's and was going to go back to Willie's and that Susan started bitching and she didn't want him to go. So he said he went into the house to get his gun out from under the cushion, out from under the couch cushion; he stuck it in his back pocket, and that she grabbed it out. As he started back out of the house, she grabbed the gun out of his back pocket. He said he wanted it back, so he grabbed for it. I asked him why he grabbed for it, and he said because it was his and because he wanted it.

> I asked him if it was an accident-I'm sorry. I asked him what happened then, and he said "It was an accident. I grabbed for the gun and it fired." I said "Where were your hands when the gun went off?" And he said "I don't know." I said "Where were her hands when the gun went off? He said "I don't know. I don't remember." I said "Why did you throw the gun in the woods behind the house?" He said "Because I wasn't supposed to have it. It was illegal."

> I said "Which one of the guns was she killed with,

Bryan?" And he became very upset, said "The Jennings, the one I laid on the couch." I said "After she was shot, what did you do with the gun?" He said "I laid it on the couch. I laid it on the couch." I said "Well, Bryan, I'd like to take a gunshot residue of your hands," and he became upset and that's when he told his mother I was trying to fuck him.

Agent Wesson stated that the officers secured a search warrant to take a blood sample from [the Petitioner] because he would not consent to giving a blood sample. They also collected [the Petitioner's] clothes to be tested for gunshot residue. The test found gunshot residue on his shirt and pants. Agent Wesson did not obtain samples to have a gunshot residue test performed for [the Petitioner's] hands. He did testify that if an individual was shot in the forehead by a weapon pressed to the forehead, the victim would have gunshot residue on their body.

The gun found in the home was a Jennings nine millimeter, semi-automatic. Two shell casings that were found on the floor in front of the couch were sent to the TBI crime lab and were determined to have been fired from the Jennings 9. Agent Wesson found two bullets, one in the wall behind the couch and another in the frame surrounding the front door. Both bullets were nine millimeters and would have fit the Jennings 9.

Special Agent James Davis is a forensic scientist with the TBI. Agent Davis works in the micro analysis section which includes gunshot residue analysis. Agent Davis received a gunshot residue kit recovered from the hands of the victim, as well as, the pants and shirt of [the Petitioner]. Agent Davis found gunshot residue on both the pants and the shirt. The pattern of the gunshot residue found on the shirt and pants is consistent with an individual who held a gun tightly to a victim's forehead and fired the gun which caused the gases in the weapon to blow backwards. With regard to the gunshot residue kit from the victim's hands, Agent Davis testified that the results were inconclusive. However, he did not find the amount of residue on her hands that he would have thought would be on a shooter's hands. If someone was holding a gun and shot themselves in the head, there would have been a significant amount of residue on their hands.

Agent Steve Scott works in the firearms identification section of the TBI laboratory. He tested that Jennings 9 and concluded that the two shell casings found in front of the couch were fired from that weapon. He also

testified that the weapon in question was not a hair trigger gun, but required seven pounds of force to pull the trigger.

Dr. Charles Harlan was the medical examiner and the consulting forensic pathologist for Wayne County. He performed the autopsies on the victim and the baby boy. He stated that the victim had a gunshot wound to the forehead that was in the shape of a star and exhibited the presence of black powder on the edges of the wound. An exit wound was examined at the base of the skull. There was a seven inch difference between the height of the two wounds. The bullet traveled from front to back. The star-shaped wound with black powder is indicative of a tight contact gunshot wound. In the case at hand, a tight contact gunshot wound is created by the weapon being pressed against the skin when the weapon is discharged. It is not physically possible to create such a wound from the gun being shot from an arm's length away. He stated that when considering the path of the bullet through the couch, the victim's head would have had to have been laying on the top of the couch cushion. Dr. Harlan concluded that the cause of death was a tight gunshot wound to the head.

Dr. Harlan also completed an autopsy on the victim's baby. Dr. Harlan estimated that the fetus was at a gestational age of thirty-three weeks. The cause of death was intrauterine hypoxia which is a shortage of oxygen to the fetus caused by the mother's death. In other words, the mother's death caused the death of the child. Dr. Harlan estimated that the fetus would have survived five to ten minutes after the victim had been shot. He also stated that "[t]here's no question that this child would have been viable."

At the close of the State's proof, the State entered a lab report which stated that [the Petitioner's] blood alcohol level when taken at the Wayne County Hospital was .02. This information was entered as a stipulation at trial.

[The Petitioner] began his case with the testimony of William Pope and Jerry Pope who know both [the Petitioner] and Mr. Moyer. They both testified that Mr. Moyer told them that when the police came to question him about the victim's death, he was smoking marijuana. Mr. Moyer also told them that because the police had caught him smoking marijuana he told the police whatever they wanted know.

Wesley Staggs worked for [the Petitioner's] father doing various things. On the day in question, Mr. Staggs was helping [the Petitioner] move furniture

-9-

from a storage unit in Florence, Alabama to the house in Waynesboro. While they were at the storage unit, [the Petitioner] showed Mr. Staggs a sawed-off shotgun that he kept under the cushions of the couch. He stated that on the way back from Alabama they stopped at a bar just across the state line. They each drank one beer. They drove to Collinwood and stopped at a combination store and bar owned by [the Petitioner's] father. Mr. Staggs had a beer, but [the Petitioner] did not want one. Mr. Staggs and [the Petitioner] discussed a gun that [the Petitioner] wanted to sell him. [The Petitioner] had the gun in the glove compartment, but Mr. Staggs did not see it. Mr. Staggs did not buy the gun because he did not have the money. He dropped [the Petitioner] off at [the Petitioner's] house around twenty minutes until 4:00. Mr. Staggs was not planning on returning to Willie's that day.

George Pulley is friends with [the Petitioner] and Mr. Moyer. He was at Willie's the day the incident occurred. He saw Mr. Staggs and [the Petitioner] come into the bar. Mr. Staggs had one beer and left. [The Petitioner] stayed but only drank one beer. Mr. Pulley would not let him have more than that because [the Petitioner] could not pay for it. Mr. Pulley and [the Petitioner] did not discuss [the Petitioner] selling him a gun at Willie's. [The Petitioner] did not show Mr. Pulley a gun or say anything about coming back with a gun. [The Petitioner's] wife and kids picked [the Petitioner] up from Willie's.

Falen Swafford is [the Petitioner's] half-sister. She was eleven years old at the time of the incident. The victim was babysitting Miss Swafford and several other family members at the house the day the victim was shot. The victim, Miss Swafford, and the other children picked up [the Petitioner] from Willie's. Miss Swafford recalled that the victim and [the Petitioner] were arguing. When they left Willie's, they returned to the house on Mink Branch Road. This was the house to which the victim and [the Petitioner] were moving. When they arrived at the house, [the Petitioner] and the victim were arguing. Miss Swafford saw the victim grab something out of [the Petitioner's] back pocket which Miss Swafford thought was a set of keys. [the Petitioner] attempted to get the item back from the victim. Miss Swafford was outside watching through a glass door. She saw the victim walk over to the big couch. At that point, she could no longer see the victim and [the Petitioner], but she could hear them arguing and glass breaking. Miss Swafford heard a shot and looked inside. [The Petitioner] was screaming and going crazy. The victim was on the couch. Miss Swafford could see blood near the victim's ears and on her nose. [The Petitioner] was screaming, "Oh,

my God. She's been shot." [The Petitioner] came out of the house and told Miss Swafford to call the police. She grabbed the children and ran across the street. Miss Swafford saw [the Petitioner] carry the victim out of the house. She also saw her mother, the police, and the ambulance arrive.

Miss Swafford gave a statement about the incident to Agent Wesson. She admitted that she had a better recollection of what happened when she gave the statement because it was closer in time. Miss Swafford denied that she saw a gun, even when the State produced her statement in which she stated she saw the gun.

Dale Ray is a paramedic who was in the ambulance that responded to the call about the victim's shooting. When the ambulance arrived, Mr. Ray saw [the Petitioner] carrying the victim out of the house and into the yard. Mr. Ray and the other technician began to work on the victim. While they were working on her, [the Petitioner] was screaming, grabbing their arms, and begging the paramedics not to let the victim die. They moved her to the ambulance and took her to the hospital. [The Petitioner] arrived at the hospital before the ambulance. Mr. Ray observed that [the Petitioner] was still hysterical and continued to beg them to not let the victim die.

[The Petitioner] was the final witness at the trial. At the time of the incident, [the Petitioner] and the victim were in the process of moving from Alabama to the Mink Branch house. Their financial status at the time was "tight." On the morning of the incident, [the Petitioner] went with Mr. Staggs down to Alabama to pick up furniture to bring back to Tennessee. They stopped at two bars on the way back to Tennessee. They returned to the Mink Branch house and began to unload the furniture. After unloading the furniture, Mr. Staggs left. The victim drove [the Petitioner] to a trailer across from Willie's bar so he could help his father refurbish it. After finishing in the trailer, [the Petitioner] went to Willie's and called the victim to come pick him up. She arrived with all the children. [The Petitioner] got in the car, and they returned to the Mink Branch house.

When they arrived at the house, the victim and [the Petitioner] began to argue because he wanted to return to Willie's. The victim did not want him to go because there were a few women there she did not like. [The Petitioner] explained that the victim did not like these women because he had engaged in extramarital affairs. The victim grabbed the keys from [the Petitioner] during the argument. [The Petitioner] grabbed the keys back from the victim. The

-11-

victim went and sat on the couch. [The Petitioner] reached over and got the gun from under the cushion. [The Petitioner] wanted to sell the gun to someone at Willie's. When [the Petitioner] walked past her, the victim grabbed the gun out of his back pocket. They then wrestled for the gun. They hit each other while wrestling for the gun. The victim was sitting on the couch, and [the Petitioner] was standing over her. The victim pulled the gun back towards herself, and the gun fired. After the shot was fired, [the Petitioner] ran to the door to tell the children to call "911." He next grabbed the other gun case and threw the other gun in the woods because he was afraid it was an illegal gun. He called "911." He did not independently remember carrying the victim outside, but he did remember the ambulance arriving. [The Petitioner] drove to the hospital and stopped at Willie's and the Handy Mart on the way to look for his father. [The Petitioner] left the hospital when the police took him to the jail. After spending some time in a cell, Officer Skelton and another officer questioned him. They first told [the Petitioner] that the victim and their unborn child had died. On cross-examination, [the Petitioner] admitted that he and the victim had a tempestuous, violent relationship. He admitted to hitting the victim on previous occasions. He stated that he kept the gun under the cushion of the couch on a regular basis. The gun was fully loaded with one bullet in the chamber at all times. The safety of the gun was kept engaged. [The Petitioner] maintained that he did not intentionally shoot the victim. He also denied threatening to kill her or their unborn child.

Milam, 2010 WL 744398, at *1-8. This time, this court affirmed the Petitioner's convictions and sentences on direct appeal, and our supreme court thereafter denied the Petitioner's application for permission to appeal that decision. See id.

The Petitioner filed a pro se petition for post-conviction relief on June 9, 2011, alleging multiple claims for relief, including that he was denied the effective assistance of counsel at trial, at the motion for new trial hearing, and on appeal.[2] The Petitioner was represented by three separate attorneys during this process—one at the trial phase of these proceedings ("trial counsel"), another at the motion for new trial hearing ("motion for new trial counsel"), and yet another on appeal ("appellate counsel").[3] Although the petition for

---

[2] Post-conviction counsel filed a written notice that no amended petition would be filed on the Petitioner's behalf.

[3] As discussed later, the District Public Defender's Office was appointed to represent the Petitioner at one point during these proceedings. The Petitioner does not allege ineffective assistance with regard to that representation.

relief raised a myriad of claims, many of those allegations have been abandoned on appeal. Accordingly, we will limit our summary to the facts relevant to the issues of ineffective assistance presented in this appeal. The gravamen of the Petitioner's ineffective claim is that his various attorneys (1) failed to present rebuttal medical evidence concerning the "tight" nature of the victim's wound or challenge the credibility of the medical examiner, Dr. Charles Harlan, who had lost his medical license following the Petitioner's convictions; and (2) failed to present a firearms expert who had tested the condition of the murder weapon and determined that it was not working properly. These witnesses, according to the Petitioner, would have bolstered his claim of an accidental shooting.

A hearing was held in the post-conviction court, at which the Petitioner, trial counsel, and appellate counsel testified. The Petitioner noted that he was convicted of these offenses following his second trial in 2000 and that his permission to appeal was denied over ten years later in 2010. When asked why this lengthy delay occurred, the Petitioner stated, "It was just [motion for new trial counsel] filing the paperwork." The Petitioner confirmed that he was represented by trial counsel at his second trial in 2000 and that trial counsel no longer represented him "around the time that Dr. Harlan started getting in trouble." The Petitioner stated that trial counsel filed his initial motion for new trial but that a hearing never occurred "until like 2007." The Petitioner also faulted trial counsel for the failure to timely pursue the motion for new trial, stating that he kept asking trial counsel about the motion for new trial, but trial counsel responded to him that they were delaying the hearing as "a favor because of the medical examiner."

Trial counsel was retained by Petitioner's family. The Petitioner confirmed that trial counsel met with him and that they had "quite a bit" of communication. Trial counsel showed the Petitioner several crime scene photos, went over the State's evidence with him, and discussed the elements of the offense with him. However, the Petitioner complained that trial counsel did not present the witnesses that the Petitioner wanted to testify on his behalf. According to the Petitioner, trial counsel was "unprepared" and did not "speak to the people that [the Petitioner] needed him to talk to."

Specifically, the Petitioner desired for trial counsel to talk with firearms examiner Robert Goodwin[4] "about the gun discharging." The Petitioner testified that Mr. Goodwin "had run some tests" on the Jennings 9mm used in the shooting and that the results of that testing "showed that the gun discharged on repeated testing." When asked when he became aware of this information that the "gun was not operating properly[,]" the Petitioner stated

---

[4] There some indication from the testimony at the post-conviction hearing that Mr. Goodwin was a TBI agent responsible for testing the weapon. However, it appears from the direct appeal record that Mr. Goodwin was retained as a defense expert, who reviewed the findings of the TBI.

that, after trial, trial counsel sent him some materials and that Mr. Goodwin's findings were included therein. Nonetheless, the Petitioner confirmed that he wanted Mr. Goodwin "to testify before trial that the gun was not operating properly[,]" being aware of this information from a previous attorney who had represented him during his first trial proceedings. When asked what benefit Mr. Goodwin's testimony would have had to his case, the Petitioner said, "It would have showed more that it was an accident, and not an intentional purpose."

The Petitioner stated that he also wanted Dr. Charles Harlan, the medical examiner who testified at the Petitioner's trial, to be called as a witness. When asked why this would have been beneficial to his cause, the Petitioner replied,

> Well, Dr. Charles Harlan had been convicted of 30 something counts, and had lost his medical license. And I had Dr. Stanton Kessler at my motion for a new trial. If I had known at the time I could have had somebody to rebut [Dr.] Harlan's testimony, and I was unable to get anybody to rebut Dr. Harlan's testimony because they claimed he was such a highly claimed doctor, and he ended up not being.

The Petitioner asserted that he informed trial counsel of his desire to present these witnesses by "[p]hone and to him personally." According to the Petitioner, trial counsel responded to these requests as follows: "[H]e was going to find [Dr.] Harlan, and then said he couldn't find him. And he told me that the [c]ourt would not pay for the other guy, which I understood from my understanding, I'm able to subpoena people to come to court on my behalf." When these witnesses were not called, trial counsel informed the Petitioner, "That they just couldn't be found. That was it. And I'm not even aware that there was even anything to be found to have them come to court."

At some point after his conviction, the Public Defender's Office was appointed to represent the Petitioner. According to the Petitioner, the Public Defender's Office "ended up handing [his] case over to [appellate counsel.]" Appellate counsel was also co-counsel, working along side trial counsel at the Petitioner's second trial, and was appointed to appeal the Petitioner's case. The Petitioner stated that he did not want appellate counsel on his case and that he tried to have appellate counsel removed "because he had left out all the evidence about Dr. Harlan and about Mr. Goodwin[,]" but that his endeavors at removal were unsuccessful. When asked what his grievances were with appellate counsel, the Petitioner stated, "He left out everything about -- he left out everything about Dr. Harlan. He left out everything about the gun discharging, and all that, sir." The Petitioner confirmed that, on appeal, appellate counsel challenged the sufficiency of the evidence, raised an issue concerning admission of a witness's statement, challenged a juror's qualifications, and argued sentencing issues. The Petitioner stated that he communicated with appellate counsel

-14-

through letters and that he did not want appellate counsel to file his appeal "period." The Petitioner claimed that he and his family "tried every way to get [his] appeal withdrawn, so [he] could redo [his] direct appeal, and then [he and his family] had to hire" another attorney for his motion for new trial.

Motion for new trial counsel was retained by the Petitioner's family. The Petitioner confirmed that, since the Petitioner's convictions, motion for new trial counsel had encountered "bar trouble in Indiana" and "trouble with the bar in Tennessee[.]" According to the Petitioner, motion for new trial counsel had left "this district" and headed to California; his most recent address was "somewhere in Utah." The Petitioner agreed with post-conviction counsel that post-conviction counsel had attempted to locate motion for new trial counsel for the post-conviction hearing, to no avail, and stated that they had "a complaint to be heard this month in front of a board on him." The Petitioner claimed that motion for new trial counsel "was supposed to do [his] motion for a new trial, [his] direct appeal, and [his] post-conviction." According to the Petitioner, motion for new trial counsel had "two hearings in front of [Judge] Hamilton." When asked how motion for new trial counsel was ineffective, the Petitioner replied, "He took my money and didn't do nothing. He messed my whole appeal on it, sir."

The Petitioner summarized that trial counsel was ineffective by failing to subpoena Mr. Goodwin, Dr. Harlan, and Dr. Kessler as witnesses; that appellate counsel was ineffective for failing to raises issues about Dr. Harlan and the gun's malfunctioning on appeal; and that motion for new trial counsel was ineffective because he "took [his] money and left."

Moreover, the Petitioner's last argument was one of "illegal evidence." The Petitioner stated that he discussed with trial counsel the State's failure to disclose that Dr. Harlan was under investigation during the Petitioner's trial. The Petitioner claimed that he and trial counsel were aware of this investigation during the trial proceedings because the investigation had been reported in the newspaper. However, according to the Petitioner, trial counsel refused to seek a second medical expert's opinion, such as Dr. Stanton Kessler, the expert who testified at his motion for new trial hearing. The Petitioner confirmed that trial counsel had an opportunity to cross-examine Dr. Harlan at trial. The Petitioner testified that his theory of defense at his second trial was that the shooting was accidental, which theory was a continuation "from the first trial."

When asked how he was prejudiced by these alleged deficiencies, the Petitioner responded, "It kept me from having a fair trial." Specifically,

If I would have been able to have Dr. Kessler or somebody in court to rebut [Dr.] Harlan, it would have been different. I've had not just Dr. Stanton Kessler that testified, but I've had Bruce Levy, Amy McMaster[], Chris Spurling, and Dr. Stanton Kessler. All have agreed from the photos . . . sent from the [S]tate . . . that the photographs that [Dr. Harlan] claimed were execution style gunshots are not what they are.

Trial counsel was next to testify. He stated that he had participated in over one hundred jury trials in the criminal realm since he began practicing law in 1983, including "dozens of first degree murder cases," and that, at one time in his career, he worked in the public defender's office. Trial counsel confirmed that he was retained in the Petitioner's case after the Petitioner's first jury convictions were reversed on appeal and that he represented the Petitioner at his second trial. His records of the Petitioner's case, which had been stored in a storage facility, had been destroyed by a tornado; nonetheless, he recalled the facts of the Petitioner's case.

Questioning turned to the medical examiner's testimony at the Petitioner's trial. Trial counsel was asked about his "decision not to employ an expert witness to contradict or potentially contradict Dr. Charles Harlan[.]" Trial counsel explained his decision as follows:

Well, I remember that Dr. Harlan was the forensic pathologist that testified in the trial. I interviewed Dr. Harlan. Of course, in hindsight, Dr. Harlan had some problems that nobody knew about at the time. But since then, had we known about them, there might have been a little different tactic taken. But our theory of the defense from the defense perspective was that there was a struggle over the weapon. There was an accidental discharge. There was nothing from an intentional or premeditated perspective on [the Petitioner's] part as far as the death of his wife and the unfortunate death of the fetus that she was carrying at the time. And that theory of the defense, and the interview that I conducted before the trial, I'm not so sure that another expert would have been needed. . . . I don't know that with our theory of defense, whether or not with the facts as I knew them to be, based on our pretrial investigation, whether another expert would have made that much difference.

Trial counsel confirmed that he interviewed Dr. Harlan before trial and had certified copies of Dr. Harlan's autopsy report; in fact, he had received the discovery materials early during his involvement in the Petitioner's case. Trial counsel stated that Dr. Harlan's issues were not known until after the jury had returned its verdict of guilt in the Petitioner's case. Trial counsel was not aware of any specific finding by the Board of Medical Examiners during their investigation of any wrongdoing by Dr. Harlan regarding the Petitioner's case.

-16-

Trial counsel could not recall any issue about "the gun misfiring during testing" by Mr. Goodwin. Trial counsel continued,

Had I known about it, and had the gun misfiring been an issue, and the gun possibly misfiring during our theory of the case being the struggle over the gun, we certainly would have brought that individual to court, and let him talk about the misfiring because it might have helped [the Petitioner's] defense.

Trial counsel remembered TBI Agent Steve Scott, the firearms expert, testifying at the Petitioner's trial that "the gun appeared to be in working order[.]" Trial counsel stated that he felt prepared for the Petitioner's trial.

On cross-examination, trial counsel testified that he did not recall conducting a background search of Dr. Harlan. Trial counsel opined that, at the time of the Petitioner's trial, "[Dr. Harlan] was one of those that was perceived to be sort of an untouchable witness because he testified in so many cases." Trial counsel was "[v]ery" familiar with Dr. Harlan's work and had tried cases before involving Dr. Harlan.

Trial counsel did not recall the Petitioner's asking for a rebuttal medical expert. According to trial counsel,

in hindsight, if we had an expert that could have testified that the muzzle to skin distance was different than the testimony of Dr. Harlan, then we would have had an expert say that the gun as it was being argued over or argued with, and went off by accident, and was closer to her skin than Dr. Harlan testified. But that's really the other thing that . . . the expert could have done was talk about that distance difference.

Trial counsel stated that the he developed the defense based upon the facts as relayed to him by the Petitioner: "[H]e told me that there was a struggle over the gun, and the gun accidentally went off."

Trial counsel was then asked about his recollection of Robert Goodwin's evaluation of the Jennings 9mm used in the shooting. Initially, trial counsel did not recall paying anyone to perform an evaluation of the weapon. After being shown correspondence from Robert Goodwin to trial counsel, which appeared to include a bill, trial counsel agreed that Mr. Goodwin had examined the weapon on the Petitioner's behalf, charging $825. According to trial counsel, Mr. Goodwin's report indicated that "a post had struck the bre[e]ch or the end of the pistol with the force of sufficient imprint; the shape of a gun -- the last blow caused the discharge[.]" When asked what impact this finding of Mr. Goodwin might have

had on the jury, trial counsel stated, "I'm not sure. I don't know that we would have a struggle between a husband and a wife over a gun. I don't know that you would ever had a situation where the gun could have been struck with the force of that nature."

Appellate counsel was next to testify and stated that he had been practicing law since 1992, that his practice was exclusively criminal defense, that he had participated in approximately eighty-five to one hundred jury trials, and that he handled over one hundred appeals. Appellate counsel confirmed that he was co-counsel at the Petitioner's trial, assisting trial counsel with research and trial preparation. Appellate counsel opined that they were prepared for the Petitioner's trial.

Appellate counsel did not recall any discussions between him and trial counsel about hiring an expert to review or examine Dr. Harlan's conclusions from the autopsy; appellate counsel was also familiar with Dr. Harlan and had conducted trials where Dr. Harlan was involved. They were not aware of Dr. Harlan's issues at the time of the Petitioner's trial. Appellate counsel opined, "And you know, the bottom line is Dr. Harlan may have had some questionable practices on specific cases and specific instances, but that unfortunately for the defense, I don't think that undoes probably 98 or 99 percent of the cases he worked on." Dr. Harlan's problems were not connected to the Petitioner's case according to appellate counsel.

Appellate counsel stated that he was appointed to handle the Petitioner's appeal. Initially, he reviewed the file, which "was a mess." In an attempt to clarify some of the procedural history of this case, appellate counsel provided the following recitation of events:

> June in 2000, the second trial concluded, and that's the trial [trial counsel] and I did. July 25, 2000, the [Petitioner] was sentenced. August 3, 2000, [trial counsel] filed a timely motion for a new trial. Okay. That stopped the clock on the motion for a new trial. August 11, 2000, [trial counsel] was appointed by the court to represent [the Petitioner] on appeal . . . .
>
> On May 24, 2003, [trial counsel] filed a motion to withdraw alleging irreconci[la]ble conflicts and the inability to communicate with [the Petitioner] "having to do with the case through the client's mother," which has affected the trust between all parties. Included with the motion was an affidavit by counsel stating that, "The [Petitioner's] mother []apparently does not trust me" -- talking about [trial counsel] -- "to zealously represent her son. She has cancelled appointments and accused me of getting paid off. She refuses to give me information. She refuses to give me information that she insists I use when I have no way of knowing what she's talking about, among other things." So [trial counsel] filed a motion to withdraw.

On August 4, 2003, the judge entered an order allowing withdrawal; and on that same date, he appointed the Public Defender to represent [the Petitioner] on the appeal.

September 19, 2006, the Public Defender's Office filed an amendment to the motion for a new trial, which is still timely.

On November 8, 2006, [motion for new trial counsel] enters an appearance as retained counsel. November 5, 2007, a year later, the trial court conducts the hearing on the motion for a new trial; and that's where Dr. Kessler testified.

On February 1, 2008, the trial court entered an order denying the motion for a new trial. 26 days later on February 27, 2008, a notice of appeal was timely filed by me[.]

Appellate counsel then relayed the procedural history of the direct appeal which followed.

Appellate counsel confirmed that he did not include the issue of Dr. Harlan's credibility due to the loss of his medical license in the Petitioner's appeal. According to appellate counsel, the Petitioner "was adamant about" including the issue of ineffective assistance of counsel in his direct appeal. However, appellate counsel refused because the issue "was never raised as an issue in the motion for a new trial" and "there [was] nothing argument-wise, proof-wise to support that issue on appeal." Appellate counsel continued that evidence of Dr. Harlan's misconduct never made it into the record at the motion for new trial level. Accordingly, appellate counsel employed the following strategy on appeal:

So being the clever lawyer that I am, and having all this information from Dr. Kessler saying, "[Charles] Harlan did it wrong," what I did was I took, as best I could, Dr. Kessler's testimony at the motion for a new trial, and Dr. Harlan's testimony from trial; and I shoved all that into the insufficient evidence argument on appeal.

Appellate counsel then reviewed the issues included in trial counsel's initial motion for new trial and which of those he raised on appeal. He could not recall what the Public Defender's motion for new trial included as issues, except possibly the denial of the motion to exhume the body. Appellate counsel acknowledged that there were additional issues the Petitioner and his mother wanted raised; however, he did not believe that those issues had any merit. The Petitioner requested to have appellate counsel removed after appellate counsel had already filed his original brief. According to appellate counsel, this court gave the Petitioner fifteen days to retain new counsel to file a supplemental brief, but the Petitioner apparently never did so, and the appeal proceeded.

Appellate counsel was asked how this issue of Dr. Harlan's credibility could have been properly perfected. Appellate counsel then testified that the issue of Dr. Harlan's credibility was presented to the trial judge at the motion for new trial stage, although not in terms of an issue of ineffective assistance of trial counsel. Appellate counsel made the statement: "Obviously, that's what Dr. Kessler and the motion for a new trial hearing all about that was about Dr. Harlan's credibility." According to appellate counsel, the trial judge commented, "Well, Dr. Harlan has not been discredited in my eyes." He continued,

> I think from the motion for a new trial standpoint, if it had affected Judge Hamilton's belief of the believability fo Dr. Harlan, then him as a 13th juror, Judge Hami[l]ton could set the case aside. And that's what the impact of that information would have had at motion for a new trial.

Appellate counsel opined that, "had it been properly preserved," he could have presented the issue on appeal in the context of a thirteenth juror issue. According to appellate counsel, the issue was more properly presented as a post-conviction issue, and in the post-conviction context, "I think the court would have to find that Dr. Harlan's credibility is impugned so much, that the outcome of the second trial cannot be trusted. And therefore, a new trial based on post-conviction." Appellate counsel agreed that this issue of Dr. Harlan's misconduct could be classified as "[n]ewly discovered evidence[.]"

Appellate counsel also had "no recollection at all that [the defense] ever dealt with the gun issue at trial." Appellate counsel first became aware of the "potential misfire issue" upon reading the post-conviction petition.

By order filed on August 22, 2012, the post-conviction court denied the Petitioner relief. In addressing the Petitioner's allegations, the post-conviction court ruled, in pertinent part, as follows:

> [<u>Newly Discovered Evidence</u>.][5] The [P]etitioner raises the issue that Dr. Charles Harlan, at the time of his trial the State's Medical Examiner, subsequently lost his medical license and was dismissed from his position. The [c]ourt points out this matter was thoroughly litigated at the [Petitioner's] motion for new trial and that the [c]ourt at that time found it to be without merit. Both [trial counsel] and [appellate counsel] testified at the hearing in this matter that to their knowledge nothing concerning [the Petitioner's] case

---

[5] Although this portion of the post-conviction court's order addresses the issue of the medical examiner's misconduct in the context of the Petitioner's newly discovered evidence claim, these findings are also relevant the Petitioner's ineffective assistance of counsel claim.

was involved in the discipline of Dr. Charles Harlan. The [P]etitioner put forward no evidence at the hearing in this matter concerning Dr. Charles Harlan that would require a setting aside of the verdict in this case. The [c]ourt therefore finds this ground to be without merit.

. . . .

[Trial Counsel.] The [Petitioner] alleges that [trial counsel] did not argue the facts of the case, that he was negligent in not hiring an expert to contradict the medical examiner, that he did not call a witness to contest an alleged misfiring of the murder weapon during testing at the TBI laboratory and that he did not argue the admissibility of graphic photographs at trial. [Trial counsel] testified at the post-conviction hearing in this case and addressed all of these issues. [Trial counsel] testified that he met with [the Petitioner] on numerous occassions and felt very prepared to go forward at trial. [Trial counsel] testified about his experience as a trial attorney and that he had defended hundreds of defendants at jury trials. He also testified that [the Petitioner's] complaints about his handling of the case were trial tactics and decisions about what he, as an attorney, believed to be the best focus for the defense. The [c]ourt finds that there was no credible evidence presented by the [P]etitioner concerning any ineffective assistance of counsel on the part of [trial counsel] and that this ground in without merit.

[Motion for New Trial Counsel.] The [P]etitioner asserts that [motion for new trial counsel] refused to call Dr. Harlan at his motion for new trial as well as the medical examiners who replaced Dr. Harlan with the State of Tennessee. He also alleges that [motion for new trial counsel] did not pursue the issue concerning the murder weapon allegedly misfiring during testing at the TBI laboratory. [Motion for new trial counsel] was not called as a witness in the case, having moved out of state and could not be located by either party. The [c]ourt does have, as an exhibit, the transcript of the motion for new trial and has upon review determined that [motion for new trial counsel] made adequate and complete arguments on behalf of [the Petitioner]. The [c]ourt finds that the [P]etitioner did not put forward sufficient evidence to support this ground of ineffective assistance of counsel on the part of [motion for new trial counsel] and finds that this ground is without merit.

[Appellate Counsel.] The [P]etitioner's sole complaint against [appellate counsel] appears to be that he did not include in his argument to the Court of Criminal Appeals the issue of Dr. Charles Harlan losing his medical license as a ground for relief. [Appellate counsel] testified at the hearing for post-conviction relief in this matter. It was obvious to the [c]ourt that [appellate counsel] had made a thorough investigation of [the Petitioner's] case during his work on the appeal in this matter. [Appellate counsel] testified that

he did not include the grounds concerning Dr. Charles Harlan because it had not been included in the written motion for new trial. However, he also stated that it was his considered opinion this ground, even if included on appeal, would have been very hard to substantiate. The [c]ourt finds that the [P]etitioner has not put forward sufficient evidence to support this ground and finds it to be without merit.

The Petitioner filed a timely notice of appeal.

## ANALYSIS

On appeal to this court, the Petitioner contends that his counsel—trial, motion for new trial, and appellate—all failed to provide the effective assistance guaranteed him by the United States and Tennessee constitutions. Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App.

P. 13(d)).  The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness.  Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial.  Strickland, 466 U.S. at 687; see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993).  In other words, a showing that counsel's performance was deficient is not enough; rather, the petitioner must also show that but for counsel's deficient performance, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The Strickland standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution.  State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test.  See Henley, 960 S.W.2d at 580.  The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability means a probability sufficient to undermine confidence in the outcome."  Id.  Failure to satisfy either prong results in the denial of relief. Id. at 697.

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.  In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance."  Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation.  Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

On appeal, the Petitioner again alleges that his various attorneys provided him ineffective assistance at the different stages in these proceedings.  First, the Petitioner's argument as to trial counsel's ineffectiveness centers on trial counsel's "failure to secure an

expert to rebut the testimony of the medical examiner and failure to obtain an expert to contest the discharge of the murder weapon." The Petitioner notes that trial counsel "had obtained Mr. Goodwin to examine the weapon [who determined] that a blow to the gun causes a misfire but failed to use him at trial and did not recall investigating the matter when questioned at the hearing." He then notes that he desired for trial counsel "to call Dr. Charles Harlan, then medical examiner for the State, to discuss the pending inquiry and subsequent loss of his medical licence for the purposes of credibility and for one witness, Dr. Stan[ton] Kessler, who testified at the initial motion for new trial to rebut the testimony of Dr. Harlan." The Petitioner continues,

> these individuals were critical to his defense and would have made a difference in the outcome of his trial by showing that a gun which may have fired indirectly due to mechanical failure could eliminate the premeditation element of first degree murder and that an attack on the credibility on the medical examiner would have given doubt in the juror's mind.

Next, the Petitioner alleges ineffective assistance on the part of motion for new trial counsel, arguing simply that "[motion for new trial counsel] took his money and did nothing." The Petitioner notes that motion for new trial counsel's license was later suspended, that he had been censured by the Board of Professional Responsibility on December 10, 2008,[6] and that he could not be located for hearing. According to the Petitioner, "[c]learly[, motion for new trial counsel] had issues reflective of his practice outside those claimed by the [Petitioner.]" Finally, the Petitioner alleges that appellate counsel was ineffective because he "failed to present evidence on appeal relating to the State's medical examiner, Dr. Charles Harlan, losing his medical license and the issue of the potential gun discharge." The Petitioner contends that "the inability" of his various attorneys "to adhere to his position in the matter affected the outcome of this case." He submits, "There appeared to be no reason for counsel to disregard his position regarding witnesses at trial and the compilation of grounds to be argued and the conclusion would have been different ha[d] they worked with him toward a common goal."

The testimony at the post-conviction hearing provided a murky picture, at best, of what occurred in the trial court for the eight years following the Petitioner's conviction in 2000. It was unclear from the testimony at the hearing and the ruling of the post-conviction court what issues were actually presented and ruled upon post-trial. Because we find a

---

[6] We note that this is the first time these specific allegations have been made; it was stated only at the post-conviction hearing that motion for new trial counsel had encountered "trouble with the bar in Tennessee[.]" There is no proof in the record that motion for new trial counsel's license had been suspended or that he had been censured on this specific date.

review of the trial proceedings to be in order before we can properly address the Petitioner's various issues, we have taken judicial notice of the entire direct appeal record in this case. See State ex rel. Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964) (concluding that this court may take judicial notice of the direct appeal record).

Although touched upon to some extent by appellate counsel at the post-conviction hearing, we provide the following additional details as to what occurred in the trial court during the eight years the Petitioner's motion for new trial was pending. In August 2000, trial counsel filed a timely motion for new trial following the Petitioner's sentencing hearing. In that motion for new trial, trial counsel included the following issues: sufficiency of the evidence, a general designation of jury instruction error, error in admission of Fallon Swafford's statement as evidence, error in denying the Petitioner's motion for a change of venue, and error in the imposition of consecutive sentencing. Trial counsel was appointed for purposes of appeal, apparently there being no funds available to the Petitioner and no agreement for trial counsel's representation to continue after trial proceedings were concluded. A hearing on the motion for new trial was continued for trial counsel to obtain the trial transcripts, and he was granted three weeks to review those transcripts once received.

It appears from the direct appeal record that nothing else occurred until May 2003, when trial counsel moved to withdraw from the case. Trial counsel cited a conflict with the Petitioner's mother, noting their disagreements and making the following averment: "She has demanded that I make time for this case as if I am not going to make time for it despite the fact that she has been told that I have been involved in a contested week long trial and will deal with this in a timely fashion when I am finished." We feel constrained to note that the three-year delay in bringing the Petitioner's motion for new trial to a conclusion is not performing trial counsel's duties in "a timely fashion[.]"

Nonetheless, in August 2003, the trial court permitted trial counsel to withdraw and appointed the Public Defender's Office to represent the Petitioner. Again, it appears nothing else occurred in the Petitioner's case for a period of over three years.[7] On September 19, 2006, the Public Defender's Office filed an "Amended Motion for New Trial and Motion for Judgment of Acquittal." In this pleading, counsel raised the following issues: a violation of Blakely v. Washington at sentencing, error in allowing juror Billy Hill to continue with deliberations, and error in denying the Petitioner's motion to exhume the body of the victim and to perform a second autopsy. We note that the only motion to exhume the body in the

---

[7] There is some indication in correspondence from the Public Defender that the Petitioner's mother requested that the motion for new trial proceedings be delayed in an effort to obtain the results of the Board of Medical Examiners' investigation against Dr. Harlan.

record was filed the same day as this pleading, September 19, 2006.[8] Regardless, in making this request for exhumation, counsel made the following averments in the attached affidavit: that Dr. Harlan, the medical examiner who performed the victim's autopsy and testified at trial that "the victim's head was pressed into the cushion of the couch and then shot[,]" had lost his medical license; that two additional experts had reviewed a photograph of the victim; that one expert, Amy McMaster, "thought the wound was a close contact wound, but possibly a loose wound"; that the other, Dr. Thomas Dearing, "characterized it as a tight contact wound"; and that this evidence of a "loose wound would have supported the [Petitioner's] theory of how his wife died," possibly negating the element of premeditation or impacting the judge's sentencing decision.

Then, in November 2006, motion for new trial counsel entered as substitute counsel for the Petitioner and requested a continuance of the motion for new trial hearing. Motion for new trial counsel then petitioned for ex-parte services to examine the conclusions of Dr. Harlan. Motion for new trial counsel specifically requested Dr. Kris Sperry, stating that unsuccessful efforts had been made to secure the services of Dr. Bruce Levy and Dr. Amy McMaster. In the order that followed, signed February 5, 2007, the court approved the Petitioner's request for funding to secure Dr. Sperry's services "to analyze the photos and notes of the autopsy performed in the trial of this cause and entered as exhibits, as well as analyzing the testimony of Dr. Charles Harlan[.]" These services also included "any testimony by Dr. Sperry at a hearing upon motion to exhume the victim's body." A case status order reflected that a hearing on the motion for new trial was reset for May 2007 in order to permit the Petitioner time to obtaining funding for the expert.

On November 5, 2007, a hearing was held, and the trial court stated that the parties were present "on Motion for a New Trial." At the beginning of the hearing, a certified copy of Dr. Harlan's licensure status was entered into evidence as an exhibit, apparently a document reflecting the Board of Medical Examiner's findings in the matter of Dr. Harlan. Dr. Stanton Kessler, not Dr. Kris Sperry, then testified, calling Dr. Harlan's autopsy findings of the victim into question. Dr. Kessler testified that the victim's gunshot wound was not a "tight contact" wound as Dr. Harlan described it, but rather, that it was a "near contact" wound, "which is almost touching." Dr. Kessler stated that the Defendant's version of events would have been supported by these conclusions. At the conclusion of Dr. Kessler's testimony, motion for new trial counsel requested time to brief the motion for new trial issues presented.

_____

[8] There is no evidence that the motion to exhume the body to perform a second autopsy was ever ruled upon by the trial court.

-26-

Thereafter, on January 24, 2008, a document filed "Brief in Support of [the Petitioner's] Motion for New Trial" was filed. In this pleading, motion for new trial counsel raised the following issues: trial counsel was ineffective in not discovering nor procuring a witness or evidence to contest the expert testimony of Dr. Harlan, noting Dr. Kessler's testimony at the November 5, 2007 hearing; trial counsel was ineffective in not discovering or procuring a witness or evidence to contest the expert testimony of James Russell Davis, II, who testified concerning the gunshot residue on the victim's hands; newly discovered evidence based upon Dr. Harlan's malpractice and loss of his medical license; the trial court's instruction to Juror Billy Hill, placing undue pressure on him; vindictiveness in imposition of consecutive sentences; and that both crimes resulted from one single act, which should have been considered in the consecutive sentencing determination. On February 1, 2008, the trial court entered an order, stating that the Petitioner's motion for new trial "was considered by the [c]ourt on the 29th day of January, 2008"[9] and that none "of the grounds submitted" by the Petitioner warranted a new trial; therefore, the motion was denied.

We now turn to address the Petitioner's issues as they are presented on appeal, and on the face of the record before us. The claim of ineffective assistance of counsel may be presented in a petition filed pursuant to the Post Conviction Procedure Act, but the Act contemplates the filing of only one petition. Tenn. Code Ann. § 40-30-102(c). Moreover, a claim of ineffective assistance of counsel states a broad, single ground for relief. State v. Rowland Keith Hall, No. E2006-00111-CCA-R3-CD, 2007 WL 1582667, at *8 (Tenn. Crim. App. July 1, 2007); Roger Clayton Davis v. State, No. 03C01-9902-CR-00076, 2000 WL 21307, at *3 (Tenn. Crim. App. Jan. 14, 2000). Once raised and adjudicated during the pendency of the conviction proceeding, such as in a motion for new trial or for Rule 32(f) relief or on direct appeal, the issue may be deemed previously determined for purposes of later post-conviction relief. Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."); Tenn. Code Ann. § 40-30-106(f) ("If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed."). Thus, Tennessee courts have repeatedly cautioned that raising the issue of ineffective assistance of counsel in advance of a post-conviction proceeding, where the claimant is availed the opportunity of an evidentiary hearing, is "fraught with peril." See, e.g., State v. Anderson, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992). After our exhaustive review of the record, such an act not undertaken by either party in this appeal or the post-conviction court, we

---

[9] It does not appear that any other hearing took place prior this ruling. In fact, this court attempted to supplement the record with the transcripts of any additional hearings, including one possibly occurring on January 29, 2008, and no record of any such hearings could be found by the trial court clerk.

determine that waiver of the issue of ineffective assistance of trial counsel is precisely the case here.

Accordingly, we conclude that the Petitioner's allegation of ineffective assistance of trial counsel has been previously determined after a full evidentiary hearing in the trial court and is, thus, waived in this post-conviction proceeding. However, this court has recognized that a petitioner retains a surviving claim of ineffective assistance relative to the performance of successor counsel in relation to his representation on the motion for new trial. See Laraiel Winton v. State, No. E2011-00762-CCA-R3-PC, 2012 WL 273759, at *5 (Tenn. Crim. App. Jan. 31, 2012), perm. app. denied, (Tenn. Aug. 16, 2012); Russell Lane Overby v. State, No. W2001-01247-CCA-R3-PC, 2002 WL 818250, at *2 (Tenn. Crim. App. Apr. 26, 2002). Moreover, this court has previously held that "allegations regarding the ineffectiveness of appellate counsel, when trial and appellate counsel are different, are not waived under the Post-Conviction Act when those allegations are not presented on direct appeal." John Earl Scales v. State, No. M2001-00310-CCA-R3-PC, 2002 WL 1949697, at *2 (Tenn. Crim. App. Aug. 23, 2002) (citing Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999)); Ronald Yates v. State, No. W2008-02067-CCA-R3-PC, 2009 WL 4505436, at * 3 (Tenn. Crim. App. Dec. 3, 2009). Therefore, we will address the Petitioner's allegations regarding the ineffective assistance of motion for new trial counsel and appellate counsel.

The direct appeal record belies the Petitioner's claim that motion for new trial counsel "took his money and did nothing." Motion for new trial counsel sought and obtained expert funding for Dr. Kessler to testify at the motion for new trial hearing. Although Dr. Harlan was not called as a witness at the motion for new trial hearing, motion for new trial counsel entered into evidence a certified copy of Dr. Harlan's licensure status at the outset of the hearing, a document which contained the findings of the Board of Medical Examiners in the matter of Dr. Harlan. Dr. Kessler testified at the motion for new trial hearing about what he perceived to be the deficiencies in Dr. Harlan's autopsy findings. Thereafter, motion for new trial counsel filed a brief raising several issues, including issues of ineffective assistance of counsel and newly discovered evidence. Specifically, the brief included the following allegations: counsel was ineffective in not discovering nor procuring a witness or evidence to contest the expert testimony of Dr. Harlan, noting Dr. Kessler's testimony at the November 5, 2007 hearing; trial counsel was ineffective in not discovering or procuring a witness or evidence to contest the expert testimony of James Russell Davis, II, who testified concerning the gunshot residue on the victim's hands; and newly discovered evidence based upon Dr. Harlan's malpractice and loss of his medical license. The trial court denied any relief following the filing of this brief. Moreover, there is no proof in the record that possible later disciplinary action against motion for new trial counsel had anything to do with his work in the Petitioner's case. We conclude that motion for new trial's performance was not deficient.

The only issue remaining is whether appellate counsel provided ineffective assistance by failing to pursue on direct appeal the Petitioner's claim of ineffective assistance of trial counsel raised at the motion for new trial hearing. The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must present facts that establish (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal; and (2) absent the deficient performance, a reasonable probability existed that the Petitioner's appeal would have been successful before the state's highest court. See e.g., Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparico v. Artuz, 269 F.3d 78, 25 (2d Cir. 2001). In examining whether counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." Id. When an omitted issue is without merit, the Petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. Id. at 887-88.

Counsel is responsible for determining the issues to present on appeal. State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986). This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. Campbell, 904 S.W.2d at 597. The determination of which issues to raise is a tactical or strategic choice. Id.

First, we note that appellate counsel incorrectly testified that the issue of ineffective assistance was not presented for review at the motion for new trial phase. The issue was developed by motion for new trial counsel, and appellate counsel was aware of Dr. Kessler's testimony. While appellate counsel is correct that the direct appeal file is a "mess[,]" that does not relieve him of his obligation to ferret out the issues presented in the trial court before proceeding with the Petitioner's direct appeal. We must conclude that appellate counsel's testimony stating that the issue "was never raised as an issue in the motion for a new trial" amounts to deficient performance; i.e., appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal. By failing to pursue the issue, which he incorrectly believed had not been properly raised, appellate counsel waived the Petitioner's claim of ineffective assistance of trial counsel in these post-conviction proceedings. While we conclude that this failure by appellate counsel amounts to deficient performance, the question still remains whether the Petitioner was prejudiced by appellate counsel's failure to raise the issue on appeal.

The Petitioner must also establish that, absent the deficient performance, a reasonable probability exists that his appeal would have been successful before the state's highest court. Accordingly, we must determine the merits of the following issue: whether trial counsel was deficient in failing to obtain another expert to rebut the State's expert, Dr. Harlan, at trial. As stated above, a claim of ineffective assistance of counsel states a broad, single ground for relief. Hall, 2007 WL 1582667, at *8; Davis, 2000 WL 21307, at *3. The Petitioner's issue regarding firearms examiner Robert Goodwin's findings that the weapon was not working properly was never raised by motion for new trial counsel as a ground of ineffective assistance by trial counsel and, therefore, has been waived. See Tenn. Code Ann. § 40-30-106.

Trial counsel and appellate counsel testified at the post-conviction hearing that they had no knowledge of Dr. Harlan's troubles at the time of the Petitioner's trial. It appears from the document submitted at the motion for new trial hearing that disciplinary action against Dr. Harlan commenced before the Board of Medical Examiners in 2003, although autopsies as early 1995 were included in the investigation. Moreover, the document supports counsels' testimony that the disciplinary action taken against Dr. Harlan did not involve the victim's case.

Nonetheless, Dr. Kessler, during his testimony at the motion for new trial hearing, called into question Dr. Harlan's findings about the nature of the victim's wound. However, even the documentation submitted by the Public Defender's Office for the motion for new trial hearing showed that counsel had received differing opinions from several experts—one expert, Amy McMaster, "thought the wound was a close contact wound, but possibly a loose wound"; the other, Dr. Thomas Dearing, "characterized it as a tight contact wound[.]" Moreover, two additional witnesses, along with Dr. Harlan, testified that a muzzle to skin gunshot wound left a distinctive star pattern on the skin, as in the victim's case. See Milam, 2010 WL 744398, at *4-7 (testimony of Special Agent Wayne Wesson and Chief Byron Skelton). Special Agent James Davis testified that the pattern of the gunshot residue found on the Petitioner's shirt and pants was "consistent with an individual who held a gun tightly to a victim's forehead and fired the gun which caused the gases in the weapon to blow backwards." Id. at *6. Additionally, there was a witness who testified that the Petitioner had threatened to kill both the victim and their unborn child just days prior to the shooting. Id. at *11. There was also evidence from more than one witness that immediately after the murder, the Petitioner went to his car, retrieved a second gun, and threw the second gun into the woods behind his house, evidencing that he had the presence of mind to try to hide something he thought to be illegal presumably because he knew the police would come to his house to investigate his wife's death. Id. Several witnesses heard a second shot once the Petitioner returned inside his home after disposing of the second weapon. Id. at *1-2. This court determined on direct appeal that this evidence supported the conclusion that the

Petitioner "intentionally shot the victim in the forehead as opposed to his story that the gun accidentally went off while they were struggling over it." Id. We agree. "[T]he jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case." Dellinger v. State, 279 S.W.3d 282, 292 (Tenn. 2009) (quoting State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995)) (internal quotation marks omitted). Therefore, we conclude that the Petitioner has not proven a reasonable probability that the result of his trial would have been different if the testimony of Dr. Kessler had been presented during his original trial. We conclude that the Petitioner has failed to show he was prejudiced in this regard.

## CONCLUSION

The Petitioner has failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel. We, therefore, affirm the judgment of the post-conviction court denying relief.

_____
D. KELLY THOMAS, JR., JUDGE